Good morning, Your Honors. May it please the Court, my name is Quinn Denver. I represent Mr. Gaines. Let me ask you a question about why you submitted a 28-J letter listing cases that had been reversed by the Supreme Court. Oh, I have no, I apologize for that. Okay. You also submitted a 28-J letter in violation of 28-J by not telling us what these cases are about. When was the last time you read 28-J? I mean, you just can't throw cases at us and expect us to shuffle around in the books. You're supposed to say under 28-J what these cases stand for and how they relate to the case. I'm sorry, Your Honor, they addressed the whole Chamber's due process claim, the basic claim. No pin sites, no statement about what they related to, and two of them were reversed. And it really caused me a lot of trouble. I apologize. I put that together too quickly. How does this happen? I don't know, Your Honor. Maybe it's my age. Are you appointed? You're appointed? I am absolutely appointed. You're not going to charge us for this, are you? I won't. Counsel, I want to move to what I think is an issue that, for me, is difficult with respect to your position, and that is why the statement, in your view, is critical to the defense. It seemed only very, very slightly potentially exculpatory. I really did not see why it was essential, and maybe you can enlighten me on that. Well, let me try to address that. There's actually two statements that Mr. Wright made. One is that Mr. Gaines was able to, he walked in whenever he felt like it, and he had been there three days earlier. Now, the whole case turned on the DNA. This case was a cold case for 30-some years until the DNA came. But the fact that he'd been there previously is completely consistent with his being there at the time of the murder. Well, it is. I mean, that's like, I mean, it just doesn't really seem to change anything. No, but here's the problem, Your Honor. If he hadn't ever been there before, the fact that But nobody said that was true, did they, that he had never been there before? That's not the case. There was no testimony to rebut where it was said that he had never been there before. Well, there was no, the only suggestion that he had been there earlier was a statement that he made to the police when he was first interviewed. But what I'm saying is there's no evidence to the contrary that was introduced by the State was there. There was no witness who said he had never been there before that would have required him to rebut that. No, Your Honor, but I think that's the natural inference it would be, is that a man's DNA is found there at a murder scene. There's no reason to think that that person would normally frequent that scene. And I think that's what he had. And then he said, originally, I had been there seven days earlier. And then when he became a suspect, he denied it. So this would have given him an independent third-party statement that would have given a possible explanation. Now, the jury was very concerned about this. The jury, this is a seven-day trial, eight days of deliberations. But Wright also had some things to say that were not helpful to him, correct, about his attraction to young girls and so on and so forth? But, Your Honor, that would be, if that came up and the question of whether Wright was going to be given immunity, that would be hearsay and could not have been introduced. That would be two-level hearsay. Well, what did Wright say that was inculpatory? You had the one statement that he always was there and walked on wherever he wanted to. I mean, that's a lot of speculation and opinion and requiring somebody to draw inferences from it. That's not even close to Chambers and the other cases that you rely on. Well, Your Honor— Did Wright say he was smoking when he was standing in the door or that he went in? He didn't say that, but there's inferences to be drawn there. The thing is, this is essential to the defense. Without that, without that information, what you have is his DNA on cigarettes in the apartment on the night this girl is killed. The jury is going to say, what in the world? How can that be? You're some guy who lives somewhere in the area, you're married and everything, and you've got your DNA in that murder scene? I'm sorry. Go ahead. I'm sorry. I thought you were— Well, I would rather answer your question. I wanted to go back to your statement that anything Wright would have said would have been hearsay because his statement was that it was Mr. Gaines who told him that he would like to have sexual relations with this individual and that he paid close attention to young girls and compended to Wright about how he, you know, wanted them. So why would that be hearsay? It's the defendant's own statements or observations made by Mr. Wright. Well, observations, obviously, would be a different thing. But in any case, Your Honor, that would be something that Mr. Gaines could decide. Was it more valuable to have some possible explanation for the linchpin of the case or to have that? Plus, that might have been kept out under 352, which is the 403 in California. And the thing that's important about this is, which makes it different from some other cases like the Christian cases, there's no reason not to think that Wright's statements are trustworthy. Excuse me. No reason not to think that Wright's statements— Not to think that they are untrustworthy. Not to think—every reason to think they are trustworthy. Why? I mean, this guy was a suspect, and he's throwing the blame on somebody else. And now he's taking the Fifth Amendment. What do you mean there's no reason not to think they're untrustworthy? Your Honor— He was a suspect. These statements throw the blame on somebody else, and he's taking the Fifth Amendment. Your Honor, he was not a suspect at the time he made this statement. He had been a suspect earlier. He had an alibi. They had cleared him. The Attorney General agrees to that. Well, I've— So he had no reason to protect himself, and he had no reason to think that this statement would end up helping Mr. Gaines 34 years later. That's in your mind he had no reason not to protect himself, not necessarily in his. Well, Your Honor— I mean, somebody who's once a suspect is always nervous. Trial court never questioned the trustworthiness of it. The court of appeal never trusted it. Where did— The prosecution didn't. Where did the defense try to bring the statement in in the trial court? When they made this dual request that either— What do you mean a dual request? I didn't read it as a dual request. It was a request to have immunity granted to this man who was taking the Fifth Amendment. What language do you point to that says it was a dual request, and in the alternative, to admit the statement? Your Honor, what I rely on is the State Appellate Court's finding. There was a question raised by the attorney general. They claimed it had not been offered into evidence. The defense says it had been, okay, and the State Appellate Court resolved that by deciding that there had been no error in not admitting it. Now, that is a factual finding, implied factual finding. It just seems to me that they alighted over the first issue and said, so what, because there's no error anyway, so we don't even—they didn't get to that issue. They just decided issue number two. Well, but they wouldn't get to that issue. It would have been procedurally defaulted. That happens all the time. We do that all the time. We say, irrespective of whether this issue is important or not, there isn't any prejudice, so we're not going to go there. But you say irrespective of this first point. But they didn't go—they did not go there. They didn't say that at all. There was a dispute made, a claim of procedural default, and it was— Aren't you up against a factual finding in this case that this was not raised in the State court? In the factual finding by the magistrate judge. Yes. And we've explained why we are not bound by that. One is, this was a pro per who said, please reconsider the findings. He had been denied counsel four times. What did the district court say about this? The district court say about—they just adopted the findings and recommendations. And that finding— Okay. The finding that you're referring to said the court of appeal explicitly found that the evidence had not been offered. That is totally wrong. I mean, you can read the opinion. That's—no one defends that. That is wrong. That's totally wrong. That's totally wrong. I agree with you. And I don't think the court should say that this man, who's trying to do the best he can, trying to get counsel, he contacted six law offices, he asked the court four times, when he said, please reconsider the findings, that, therefore, he didn't say specifically this factual one, he should then be barred from challenging it, unless he was told that. Where is Wright's statement in the record, the one that you are claiming should have been admitted and wasn't? The statement is in 3787 of the— It's in Appley's supplemental excerpts. I can't read the page number. It looks like 7, page 7. S.E.R. 7. Appley's S.E.R. 7. The page I have is the— It's 3787 of the transcript. 3787, that's right, correct, Your Honor. There's a quote from a report of a police officer who took the statement from him. I can read it to you. That's where it's spelled out, 3787 of the— Of the transcript? Of the transcript. And what page of the record, of the excerpt of record of the supplemental? 7. 7? Yes. I don't know. You don't know? I'm sure Judge Graber is correct if she said that. You've used up your time, but we'll give you a minute for rebuttal. Well, the only thing on the waiver, we've given you two reasons why you don't think you should not reach this. And I think that if the Court looks at the fact that the jury— Counsel, the extra time is going to be for rebuttal, but you've used up your time. Oh, I'm sorry. Thank you. Thank you. Good morning, Your Honors. David Andrew Eldridge, Deputy Attorney General. Would you speak louder and into the microphone, please? Apologies. David Andrew Eldridge, Deputy Attorney General for Respondent. I think, like Judge Graber, this case comes down to me as to whether this was— I think it's crucial, and I guess the Court of Appeals decided it was not crucial. And why do you think it's not crucial? Well, I agree with the earlier comment that it is only potentially exculpatory, and in fact, I think it falls on the other side because a statement that he stood at the door isn't really consistent at all with a statement that he came inside and could have put down. He said there's two different statements. Well, he does say that he came over all the time, but I should be really clear. The DNA on the cigarette didn't show that he was there that night. It showed that he was there. It certainly is what focused the police onto him. But the jury couldn't have relied on that to show that he was there that night. The evidence that he was there that— What did they rely on then to convict him? There was the identification from Kuhn or Kuhns. Even though it was slightly—it was somewhat inconsistent, there was also— How many people did that witness identify? I think—well, it was more than one. I don't remember exactly how many. Well, that's not the greatest of evidence, is it? It's not. My point, Your Honor, is that the DNA is not what placed him there that night. So whatever focus there is on the DNA— There was one witness who couldn't get her identifications straight. Also his lying, and also the—his what? Also the fact that he lied about his whereabouts that night, Your Honor. So we have—we do know he was there at some point. The DNA shows that. We have a witness that placed him there that night. Even if that witness has been inconsistent, it seems plain enough the jury credited that witness. And he did lie about— The lie was, I was never in that apartment? Is that the lie? No. No, he—I think at one point he did say that, but he at one point said he was home all night with his kids. At one point he said, no, I wasn't home with them. I went out later. He himself is demonstrating his own consciousness of guilt. But I—while this Court has— I'm having a hard time understanding you. Could you just go back to my first question? Why wasn't this evidence crucial? Well, it wasn't— Give me one, two, three why it's not crucial. It, first of all, wasn't particularly helpful. In fact, it is inconsistent with an argument that—it is inconsistent with a factual recitation that not only was he there, but he entered. Because if you take the witness's statement, or Ricky's statement, he's not a witness, he stood at the door and that was it. The statement that he was over there all the time would give indication that he was there on the night that Ricky was there. But there's no argument and there's no suggestion whatsoever that Ricky was there that night. Ricky can't talk about whether or not he came over on other nights. So the—it actually isn't that helpful. The fact that he may say, I didn't have anything else, doesn't make it crucial because it's still not helpful. At the same time, Your Honor, if I may, the question isn't entirely whether the evidence was crucial because under Nevada v. Jackson, the Supreme Court's made clear it hasn't had—it hasn't made any rule that somehow if you've got crucial evidence, you're entitled to admit it over state rules. Well, we're one step removed from that anyway because what we're really reviewing is whether the California court's decision that it wasn't erroneous or unconstitutional is unreasonable under Supreme Court precedent. So we're not really reviewing it on our own hook anyway. I fully agree. And I think once you—once you read Nevada v. Jackson, it becomes clear that a number of prior cases, including Chambers v. Mississippi, don't nearly establish as broad a rule as has been previously thought. The Supreme Court made clear that what it has—it has rejected categorical rules that make no sense. It has never said that it allows federal close scrutiny of a state court ruling, a discretionary ruling in an individual case, but rather broad categorical rules. Chambers v. Mississippi, which is so routinely cited, actually was a case involving what the court called strict application of certain rules of evidence. And it was not specific to that case, but rather a broad rule, a rule being you can't cross-examine your own witness who didn't actually accuse you. That's not a specific case—that's not a case-specific ruling. That's a broad rule, which the court found that makes no sense whatsoever. In Holmes v. South Carolina, the rule was you may not—the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that it believes strongly supports a guilty verdict. Again, that's not a specific case ruling. That is a broad rule, which didn't make any sense. In Crane v. Kentucky, the other case cited, the rule was you can't challenge the reliability—the defendant couldn't challenge the reliability of his own confession by showing the circumstances of it. All he could challenge was whether it was voluntary. Again, a categorical rule rather than a case-specific rule. There is no plausible argument. The State court here applied the rule—and the rule is hearsay, by the way. They didn't apply that mechanically at all. If they had, this would have been a much shorter opinion because they would have said this is hearsay, end of story. Instead, they walked through the constitutional analysis, made a very careful reasoned one might think there's a better argument to be made. There's no Supreme Court case allowing it to be second-guessed under EDPA. Now, let me go back again to what the evidence was of this defendant's guilt. You say Kuhn identified him. Yes. Did she say at the trial, that's the person? I do not remember if it was at the trial. I know that—I can—if you give me a moment, Your Honor. Well, you said the DNA is not all that important. I said the DNA—no, the DNA places him in the apartment. But not at the time of the murder. It isn't. Okay, so you say that Kuhn identified him at the trial, but you don't know what Kuhn said. Because she's the one who then was taken into a venue with 200 people, and she said, that's the person. Your Honor, we are not looking— And that's wrong, right? She certainly identified someone else, yes, at some point, yes. But— So you have Kuhn, and you have DNA, which puts him in the apartment who knows when. You may be—well, you may be making— What else do you have? And he said he was in his apartment all night. We have him—well, no, we have him inconsistent about what he did that night. Well, you know, I was a prosecutor for 23 years, and I'd have never filed that case. You may be making a good defense argument to the jury, Your Honor. Your Honor, is it 30 years later that she identifies him, if she did, at trial? No, it was the day after the murder. No. Well, the day after the murder. But what'd she say at the trial? I don't recall what she said at the trial, Your Honor. Was she called at the trial? I don't recall that either. You don't know that either? No, and here's why, Your Honor— Do you know the record in this case? I don't know it as perhaps as well as I should, Your Honor. But the fact is, this case isn't about, independently, how strong the evidence was, because the jury found it sufficient to convict, and there was no argument that it was sufficient to convict. Okay, what do we do with the state court? We look at whether any determination of facts was unreasonable. The state court—what did the state court say? This was no big deal, so— Well, that wouldn't be a factual finding at all, Your Honor. That would be an analysis. Okay, but the state court said it wasn't a big deal, right? They said the evidence had some tendency to help, and in some way it tended to hurt, and in some way it didn't tend to do anything, so it was not essential. Isn't Mr. Denver right that you could easily make a motion to sever that part of the evidence that hurt? The opinion that he—well, the part that he said that he was interested in young girls. No, Your Honor, because at that point he is saying, I want to disregard the state's hearsay rule for my purposes, but somehow bar the state, strictly apply it against a state, so they can't admit it. And there is absolutely nothing in that territory to say that a defendant, once he steps out of the state's rule, can say, but it has to apply strictly to the state. So the idea that, well, you have to let in my hearsay under the Constitution, but somehow you can bar the state's hearsay, there's nothing for that rule. We would, in fact, be no longer operating under the state's hearsay rule. This case is beyond weak in terms of its factual underpinnings. Beyond weak.  If I had a thesaurus, I'd give you the right word. I can't agree, but that's also simply not the issue before this Court. The issue before this Court isn't whether it was a particularly strong case. It is whether a piece of evidence he wanted in, on a case where there's no dispute as to the sufficiency of the evidence, and therefore no reason to task the jury who made that call. The question is whether under the Constitution he had a right so clearly established that no state court reasonably could disagree to put in a piece of evidence, and he didn't. To disagree with what? To disagree with whether or not he had a right to put in that evidence. Someone could, sorry? So we look at the evidence that we're talking about, and what do we measure that against? You don't really measure it against anything, because this was not a categorical exclusion, Your Honor. You are asking how do you overlook the state court's case-specific analysis, and my point is, you don't. What was the case-specific analysis? The case-specific analysis was. Case-specific analysis. The case-specific analysis that the state court did, but which this court does not micromanage, was that this evidence had some tendency theoretically to help. There was a downside to it because something else could have come in, and in another area it was vaguely neutral. So they didn't, the state court did not. Don't they necessarily have to look at the case itself? I mean, if there were five eyewitnesses and it was on a surveillance camera, that might say, well, this is weak, doesn't make any difference. But don't they necessarily have to look at the strength of the case? I'm not aware of actually a. So they do this in a vacuum? They were certainly aware of the facts, Your Honor, and I am sure that in evaluating whether this tended to disprove anything that the state showed, they considered that, whether they remarked on it or not. But the fact is, the evidence essentially fell of its own weight. It wasn't particularly meaningful. And the argument was that it was absolutely critical. It wasn't absolutely critical, even in a vacuum. Thank you, counsel. Mr. Denver, you have a minute for rebuttal. Thank you, Your Honor. As far as the state court, Your Honors, they recognized the significance of the evidence. They said it bolstered his argument that cigarette butt, on which the matching DNA was found, was left in the apartment prior to the night of the murder. What they then said, though, however, was it only corroborated his own statement. The court in Lundberg v. Hornbeek has said that a statement by an independent witness is much different than... What statement did it corroborate? The defendant? What statement? Oh, the defendant's statement that he had been in the apartment earlier. And the other thing they said, so they're saying that it was only corroborated. The corroboration was really important because there had been two statements by the defendant, and this would corroborate the one that would give the innocent explanation. The other thing they said was that it was cumulative, but it wasn't cumulative. It's a much different kind of evidence coming from a third party than from the defendant. And even in chambers where there was a statement by McDonald that he made one in court, they kept out three. The court said, nevertheless, those three were not cumulative to what he said in court. Thank you, counsel. Thank you. The case just argued is submitted, and we, again, appreciate the helpful arguments from both of you.
judges: Restani, Trott, Graber